We will call our, let's see, let's make sure that Judge Graves is back on. I am back on. Okay, great. Thank you. Alright, this will be our, yes, our final, fourth and final case of the morning. Number 25-30010. N. Ray Aries Marine Corporation v. United Fire & Safety. Mr. Greenbaum. You may proceed. Good morning, Your Honors. Aaron Greenbaum and my colleague, Meredith Wong, on behalf of Aries Marine Corporation, the appellant. This case arises out of a lift boat listing incident in the Gulf of Mexico involving the RAM 18 lift boat. A third-party contractor worker named Glenn Gibson was on board. He was one of seven third-party contractors on board. He was employed by United Fire & Safety, which, like Aries Marine, was a contractor of Fieldwood Energy. Mr. Gibson alleged injuries and filed a claim in Aries Marine's limitation action that it filed following the incident. Aries Marine demanded defense and indemnity under the contract between Fieldwood and United Fire. There were cross-indemnity provisions there among contractors. And the district court denied Aries Marine's motion for summary judgment and granted United Fire's cross-motion for summary judgment. Aries Marine's position is that the district court erred really in two respects. The first is that the district court ignored Fieldwood's expectations for the contract, looking solely to United Fire & Safety. And what I do want to mention there is that I know many Dwaron maritime cases look at whether there's a counter declaration, but there actually was no counter declaration or affidavit on behalf of United Fire in this case about its expectations for the contract. And Aries Marine's second position is that, basically, if there ever were a case to look at the actual involvement or usage of a vessel in a contract, this is the one. To this end, I know Judge Duncan and Judge Graves, you were recently on panels for Dwaron maritime contract matters, where defense and indemnity was denied and that was affirmed. But I'll cut to the chase and let you know why this one is different. Yeah, I was going to ask you about Genesis. Genesis was the one I was on. Right, so I know your Honor was on Genesis and Judge Graves, you were on the Ousey case. Okay. Here, what's different about this case is that the lift boat was heavily involved in the construction process that was ongoing on the platform. The lift boat, Ram 18, was physically affixed to the platform via a walkway. That ruling by the court actually was affirmed by this court in case number 23-30564, where the Ram 18 was found to be an invitee of Fieldwood onto the platform. So, this was an unmanned production platform. The crane on the platform was inoperable. Okay, I think that's key. The counsel under Dwaron, and I'm not sure I'm pronouncing that correctly. Don't we have to take a couple of steps before we get to looking at how it was actually used? Yes, Your Honor. So, the first step under, and I always call it Dwaron, but I don't know either how to pronounce it correctly. Well, I think people from Louisiana would probably call it Dwaron. Judge Graves is not from Louisiana, so he can call it something else. We would call it Dwaron. But I don't know whether that's right or not. I think it is right. I need to call the counsel who represented that company in that case. I'm pretty sure it's Dwaron. So, the first element we look at is, is the contract one to provide services to facilitate the drilling or production of oil and gas on navigable water? So, I think that one here is fulfilled. I don't think there's really an argument by the parties that that one's an issue. But the second one, Your Honor, is the biggie, right? So, if the answer to the first question is yes, then we look at does the contract provide or do the parties expect vessels to be involved in the work? Or, I'm sorry, vessels to be involved or to play a substantial role in the completion of the contract. And we tend to exclude transportation, use of the vessel in transportation or in crew quarters, I believe, also, which was what Genesis was. Right. Yeah. I think the Genesis case does say that, Your Honor, is that that was relegated to transportation, which is really not even an issue here. Although, the RAM-18 did act as crew quarters as well because it was an unmanned production platform. So, here, does the contract provide or do the parties expect that a vessel will play a substantial role? And Dwaron actually goes on to say, if the scope of the contract is unclear or the extent to which the parties expect vessels to be involved in the work is unclear, then courts may permit the parties to produce evidence of the work actually performed and the extent of the vessel involvement in the job. So, Arie's position is, here, you have two contracts at issue here that kind of gel together to make these obligations among field goods contractors. The first is the master services contract between United Fire and Fieldwood, which is a pretty vague services contract. It was entered into pre-Dwaron in 2013. And the second contract is a master time charter between Arie's and Fieldwood for chartering the RAM-18, which is undoubtedly a maritime contract. That was also entered into pre-Dwaron. So, the UFS master services contract, like I said, is pretty broad, but it does have some references to vessels in it. And it does specifically reference that United Fire expects that they're going to do work offshore, okay, and on navigable waters. The watercraft exclusion is deleted from that contract. It specifically mentions work on offshore waters, including marine transport. There is a cross-indemnities clause entered into by United Fire where it agrees to indemnify Fieldwood's other contractors who have likewise agreed to indemnify it, okay? And so that kind of cuts Fieldwood out of the equation, and the contractors just seek indemnity from each other. But United Fire entered into that cross-indemnities clause knowing that its employees may be doing work on or with vessels involved. And it specifically says that other contractors, which could be vessel owners, are to be considered third-party beneficiaries under its contract. And then finally, that master services contract states that the general maritime law is going to apply for work that is contemplated on navigable waters. So, we do have some references to vessels there. Maybe not to the extent of other cases where they have been found in the maritime contract. So, we look to the work order here. And the work order that was provided by Fieldwood through the company man out there, Clarence Oliva, is likewise… I want to make sure, counsel, are you agreeing that there's not enough in that master service contract to indicate that they contemplated the use of vessels? So, I will acknowledge it as broad. But it also doesn't state they're going to work on platforms either. And so then, your honor, we go to the next part. But the work order is part of that contract as well, I think, is what the case law says. And the work order is also broad. The work order is just saying that workers are going to go out to the platform, including Mr. Gibson, who was the fire watch for this welding crew. And that's where I'm headed. I mean, to the extent there's any mention of vessels, any significant mention of it, it has to do with transportation in that master service contract. Well, it also, your honor, does have to do with the general maritime law applying for work that's contemplated on navigable waters. And the watercraft exclusion is deleted with respect to additional insured obligations. So, they did contemplate that at some point they could be indemnifying a vessel or a vessel owner. So, the work order is likewise pretty broad. And so, the work order is pretty silent on vessel. Here, there's no declaration in the record from UFS, and there's no testimony that it did not expect a vessel to be involved. And so, a big point here for Ares is that Fieldwood undoubtedly expected a vessel to be involved in the work that United Fire was going to perform out there with the welding crew. So, they were removing, there was six employees of Fluid Crane who were welders, and then Mr. Gibson for United Fire was their fire watch on this platform. The platform crane was inoperable, meaning you needed the RAM-18's crane to do this work. So, the crane was on the vessel, the RAM-18? Yes. And you're saying the work, the crane, in what way was the crane on the vessel being used in the work on the platform? So, there were two cranes used, Your Honor, a smaller crane and a larger crane. The cranes were used to remove from the platform when these welders cut out large 300-pound pieces of braiding. The vessel crane was an integral part and necessary part of the construction process because it would remove the braiding from the platform. Basically, the job could not have been done without this lift boat on site and jacked up to working height and working basically on the platform. So, in that sense, this is similar to the Berrios case, I believe. I would also say that this case is pretty similar to the, and I don't know if I'm pronouncing this correctly either, but the Quiroz case, which was Judge Zaney's decision out of the Eastern District of Louisiana, and I saw that that was cited with approval in the Genesis v. Danos case. And I actually, I went back and read over the Quiroz facts, and in that case, very similar to a work barge being out there being an essential and necessary part of the construction process. Also similar to the Crescent Energy case. And there, this is the Quiroz case, the work barge was helping, in that case, move pieces of the platform back on, which also was going to happen here if the lift boat did not list and eventually capsize. So, the lift boat here was really a substantial part of this job. And I do want to note just a few things about some of the underlying facts here. The lift boat was chartered by Fieldwood on the same day that the work order was issued for UFS to go out there. Fieldwood's testimony is that it knew it needed a lift boat out there. The crane was locked out and tagged out on the platform. The lift boat definitely made up a substantial portion, monetary-wise, of this work. The day rate was $6,500. And I believe the crew, the seven-person crew out there of fluid crane and United Fire Workers, was maybe $5,000 a day total. So, you've got greater than 50% of the actual contract was the lift boat. So, other ways that the crane was used—I'm sorry, I went off on a tangent, Your Honor—but other ways that the crane was used was to lift heavy equipment onto the deck of the lift boat and also onto the platform. This included sandblasting equipment, air compressors, toolboxes. The vessel functioned as a workspace and a meeting space for the third-party workers on board, including Mr. Gibson. It also was a quarters and galley, which is not dispositive here, but it is for consideration. The company man, Clarence Olivo, his testimony is clear, and I believe undisputed, that the workers could not have performed their work without the lift boat there to be part of this construction job. So, the contract with United Fire isn't really clear about vessels. The work order isn't either, but the actual usage is substantial here. And just the usage is, just so I get it, the crane was affixed to the lift boat, was used to remove grating from the platform. Did you say that earlier? Yes, so it was used to remove— And to lift heavy equipment onto the platform. Yep. And for meeting space and quarters. Okay. Yeah, so this, I think this goes beyond the U.C. case, and it goes beyond the Danos case. One thing I also did want to mention, and this is just putting this in perspective, because of the cross indemnities clauses, if an Ares Marine crew member had been hurt and sued United Fire, Ares Marine would definitely owe defense and indemnity. But this is the same job, the same circumstances, and the district court here is finding that it's not a maritime contract in the Louisiana Oil Field Indemnity Act clause. Just a consideration. Thank you, Your Honor. Well, thank you. You have saved time for rebuttal. Mr. Staines. Good morning. Good morning. Good morning, Your Honors. May it please the Court, Tony Staines on behalf of United Fire and Safety. Judge, this is a—judges, this is a Durawan case. It starts and ends with Durawan. Now, there have been some cases that have interpreted Durawan, obviously, starting with the Barrios case. Oh, you mean Dwaron. You mean Dwaron. You're saying Durawan. I can't change that. I just want to make sure we talk about that. That en banc decision, right? I always refer to—call it Durawan, and I can't change that. That's okay. So, Judge, like I said, Durawan is the start and end of this case. But there have been interpretations of Durawan, obviously, as you well know, starting with Barrios, then the, excuse me, Paulfinger, and Crescent cases. Those three were what we were looking to primarily. Kiraz is another case in the District Court with Judge Zaney. But those cases that followed Durawan addressed the subject—they use the word central—subject, focus of the contract. The contract between the parties in looking to the expectation. I don't think I need to get— Yeah, we know the test. You know the test, the Durawan test. You know, and it's look at the contract. Does it provide for substantial use? Or look at the party's expectations, and does that provide for substantial use? Or do they expect substantial use of investment? Well, Durawan started that test, obviously. And then those three cases that I just mentioned to you—and I'm going to add a fourth, Kiraz, because it was brought up by counsel— the Barrios, Crescent, and Paulfinger cases all found a maritime contract because the focus of the contract between the parties to that contract had vessels involved, included in the contract. And a very interesting—in Kiraz, that the counsel referred to and tried to find some similarity to this case— Judge, in that case, the parties who contract, who entered into the contract talking about what was going to be done out there in that workplace included the Derrick Barge Schwing Thompson, which was the vessel, and that because the contract included the vessel, the court found it to be maritime. Paulfinger is a fantastic case for finding maritime because a lifeboat is a vessel. And the inspection and maintenance of the lifeboat— That was the one where the contract was for the repair of the life vessels? There was one where the contract itself was for the— That's it. It was a maintenance and inspection of the platform pursuant to the Coast Guard regulations on vessels. And the lifeboat was the center of that contract, and the court said, you know, we're going to look at a conceptual approach, not a spatial approach, if you remember that language. And we're not looking at where the contract was entered into or where the work was done. We're interested in what was the subject of the contract. Did it involve a vessel? And in those cases, Crescent, Paulfinger, Barrios, and Quiroz, all four, subsequent to Derwan, involved the subject matter of the contract being a vessel. Now, let's look at the other two cases, which came about after we even filed our briefs, the two most recent cases, which first is offshore oilfield services. And offshore oilfield services had a lot of similarities to this case because it involved field work. And the courts looked to the same contract, master service contract, in that case as we're looking at in this case, which is the first. Does the contract provide for substantial use of a vessel or expectation of substantial use of a vessel? And in that case, first of all, when I refer to contract, I'm referring to the master service contract and the work order. And in both cases, oilfield services and this case, the work order was an email which was sent out by the company name. So let's first look at the master service contract. The master service contract in both cases looked to, is there a reference to a vessel? Okay. The first part, section 2A of the master service contract, talks about performing work, deliver goods, render services, typical master service contract. But this one has a little bit more language than just that, that general language. This one also refers to whenever work is to be performed under this contract, involves work sites located offshore or within inland waters, company, unless otherwise agreed to in writing, shall have the obligation to provide marine transportation for equipment and workers in association with the work. So here it is, a vessel is referenced, but it's for transportation and offshore oilfield services. Council for Offshore Oilfield Services talked about at the very end of that section 2E, talk about, you know, while such equipment is being loaded or unloaded from any vessels, and got into a discussion in that case, not in our case, but in that case about offshore, excuse me, loading and offloading the vessel being an activity that involves substantial use for the vessel. We don't have that in this case. And what we do have in this case is the same as they had in offshore oilfield was an appendix that references the work to be done. And interestingly, there is a section that can be checked off that is, that references marine vessels, operations slash services. It's not checked off in this case. What is checked off is marine aids to navigation, which as we all know is lights and so forth on platforms, which they may do work on, but that's not a vessel related work. Also included is a section in the appendix for platform. It references jackup. Nothing is checked off here. But when we look to the work order, which is an email from Mr. Oliva, the contract company man for Sealwood, it references in the subject. So, Aries Marine kind of glosses over this and says, look, there's no platform reference. There's no vessel references. It's just very broad. The subject says crew mode WD68U, 11, 16, 18. So, Aries Marine receives this and they know now they're going to a platform. So, it doesn't say lift boat. It doesn't say any other vessel. It says WD68U, which is West Delta 68, which is where they went, which is where the work was done. So, let's talk a little bit about Mr. Gibson in his testimony. Give us a little outline of what happened that day on the 16th when they went out. He goes to the dock. They're going to go to offshore. They are sent to another platform, 43, which is the main platform for Sealwood in that field. Very close to 68, but they've dropped off there. And Mr. Gibson says, well, we can get off and take our stuff with us and get on the platform. I'm thinking we're going to eat, eat, sleep, and live on that platform. Shortly thereafter, they're transferred to 68U, which is where the work was done. And they just went to the platform. Lift boat wasn't even there yet. They're thinking, they're thinking, I'm going offshore that morning. I'm going to go do my work wherever they tell me to go do it. And I know it's 68U platform. So, I'm going to eat and sleep somewhere out there to do my work on the platform, whether it's a lift boat, whether it's another type of facility. In fact, it could have been the very platform, the main platform that had living quarters on it that they could have slept on. No idea that a lift boat, a vessel, was going to be involved with their work to do, as you know, and we briefed it, to have Firewatch does checking on the welder's work, which is the fluid crane people that were out there who also had a contract with Sealwood. And our contract, our contract dealt with providing Firewatch services. And that's what we're doing. And it does not involve a vessel. None of the work was done of Firewatch services on a lift boat or any other vessel. It was all done on the platform. No equipment needed to be transferred from the lift boat to the platform for Mr. Gibson to do his firework. It was a one-man show. He supervises himself. He watches the welders. He monitors. He said when he got on the platform, he checks it out first to see everything's safe, no fire problem. He checks on the welders. They do their work. He does safely. He stays after they leave, and he's got two monitors that he's using to do his work, and they're the size of a cell phone. So no equipment is necessary to be transferred. Let's talk about the lift boat for a second as well. The lift boat, Judge, served as a housing, meals, bathroom facilities, and after they ate in the morning on the 18th, excuse me, on the 17th, they got there on the 16th, did some work on the platform, walked over to the lift boat on the catwalk, the gangway that was provided, ate and slept, woke up the next morning, had a safety meeting there in the galley, and then went to the platform and did all their work. The purpose of the lift boat in conjunction with the work being done by United Fire was housing, meals, that type of stuff. If they kept, and it's true, they kept some equipment on the lift boat, and it was transferred over to the platform for work of the fluid clean people, not United Fire. We've got, as counsel properly referred to, a contract between United Fire and Fairwood, and Judge Affrick said, that's the contract that we look to. We look to that for the expectation of the parties, and the courts refer to shared expectations. And all the cases talk about parties, plural, expectations. So in that prong of the Durban test, what do we look to? We look to what was expected between United Fire and Fairwood, and United Fire expected they're going to go do work on a platform. The work order says WD68U, not a lift boat, nothing else. Now, what did Fairwood expect? Counsel refers to Fairwood, excuse me, yes, Fairwood and Aries. That's not the contract that we look to for the expectation of United Fire and Fairwood. We've got to look to both of them. And Judge Affrick properly determined that we know what United Fire's expectations are. They were doing all their work on a platform. They expected to do work on a platform. It had nothing to do with a lift boat. Neither the master service contract nor the work order referred to vessels in any fashion, really, other than I just stated earlier. So what did Fairwood expect? Well, then, in the motion for reconsideration, counsel for Aries brought up, well, the court didn't consider Fairwood's expectations. The court, Judge Affrick said, no evidence was presented to me for me to consider Fairwood's expectations. I find that there's insufficient evidence to determine Fairwood's expectations. Even if they gave it to me, there needs to be a shared expectation. And I know what United Fire's expectations are. It doesn't matter what Fairwood's offer. Now, Fairwood and Aries Marine had a contract, and their expectations were for the provision of a vessel, obviously. But that's not what is at issue here. What is at issue is, does the contract between Fairwood and United Fire provide for a substantial use of the vessel or contemplate the expectation of a substantial use of the vessel? Judge, the Genesis Marine case, which I know you, Judge, are familiar with, in footnote three, stated, excuse me, let me make sure I have it right. Now, in Genesis, there was a reference to the vessel contract. Genesis, in addition to contracting with Danos, like in this case, Genesis contracted with Boatruck for the use of a vessel. And the court referred, Genesis presented three contracts, a master service contract, a work plan, and then the Boatruck contract. And so the court looked at that. As in this case, the court has every option and availability. In fact, Judge Affrick did, looked at Aries Marine's contract. So, but the court said, the Boatruck rental bid document does not shed much light on the expectations of the parties, as only Genesis was a party to the bid document, citing Derlon and Offshore Oilfield Services. Courts have held that the Fifth Circuit's expectations of the parties standard requires there to be a shared expectation that a vessel would play a substantial role. Judge, Genesis and Offshore Oilfield Services, the two more recent cases decided by the circuit, are on point in terms of determining whether the contract is maritime or non-maritime between the parties. You look to the expectations of those parties or the contracts applicable to those parties to determine whether there is a substantial use of a vessel or whether the contract is maritime. So Judge Affrick determined that he didn't need to look at anything beyond the use of a vessel. Okay, because he found that the, it was very clear that the expectation of the parties did not contemplate substantial use of a vessel. If, big if, this court were to determine that they needed to look at the use of a vessel, as I stated earlier, this lift boat became an afterthought to United Fire, because United Fire, when it entered into its contract, didn't know that there was going to be a lift boat. The lift boat even, after they got on 68U, the lift boat came later on the 16th. And then they came to know, okay, we're going to eat and sleep and live on the lift boat, which again is an incidental factor, not a main factor to consider, not a factor to consider in the determination of expectation of the parties and substantial use of the vessel. And even if when you get to looking at use of the vessel to determine whether it's substantial, that still only goes to the expectation of parties, not as a separate factor in and of itself to determine whether the contract is maritime or non-maritime. So when we look at the lift boat again, the lift boat provided housing, incidental use, a galley, bathroom facilities, all incidental uses, and did not have a role in what work United Fire performed. And Mr. Greenbaum referenced a crane that he said was affixed to the lift boat. It was used to remove some grating from the platform. It did. It's my understanding that the evidence is that it did transfer some grating to the platform. And Mr. Greenbaum alluded to, and I don't know if he finished his sentence, but the crane on the platform was inoperable. So the lift boat became essential, if you will, to the need to transfer some equipment. But that equipment was for the United Fire welders to move some things out of the way. The crane was primarily used to move some things out of the way so they could get their work done on the platform deck because they were removing grating and handrails and so forth. That has nothing to do with United Fire. This concept that there is a meshing of these two contracts is, Judge, I think totally inapplicable and doesn't govern the facts of our case or the law applicable to this case. As Genesis Court dictates to us, that I read in the footnote, that particular use of the lift boat is not essential to the determination. It's not determinative in determining shared expectations. Let's see if I have anything else. I've got a minute left. Again, Judge, both the work order and the master service contract do not provide sufficient information for this court to determine that Judge Afric erred. In fact, Judge Afric did not err in his determination. He followed Durand to the T. He looked to the contract, he looked at the expectation of the parties, and he said, that gives me enough information to know that this contract is non-maritime. If the court has no other questions, I think I am done. All right, thank you, Counselor. Thank you very much. Mr. Greenbaum, you have five minutes for rebuttal. Your Honors, the argument from Aries is not that the two contracts mesh. It's that the RAM 18 was expected by Fieldwood to play a substantial role in the completion of the United Fires contract and therefore it's a maritime contract. There's one other case that has a vessel on a platform, just like this one, and that's Palfinger. And I went back and I was looking at some of the language from Palfinger, which I think is applicable here. The court noted that, just like here, the Dwarron test allows a finding that a contract is maritime when a vessel is not the object of the contract. And yes, the RAM 18 is not going to be in United Fires Master Service contract from 2013. This is Palfinger, page 813. The overarching consideration is whether it was contemplated that a vessel would be necessary to perform the job. And here, Fieldwood knew that a vessel was necessary. United Fire, just like basically every other potential indemnitore in these cases, is going to say, I did not anticipate or did not contemplate that a vessel would play a role. And so what's happening is the Dwarron test is devolving into a battle of declarations where the party that's going to owe indemnity just gives a self-serving declaration. But in this case, there is no declaration, affidavit, or testimony from United Fire saying it did not contemplate that a vessel would play a substantial role in the completion of its work order. It is silent. It is unclear. Well, wouldn't you have to contemplate it? Wouldn't you have to contemplate it to say you do not contemplate it? I mean, that means you're contemplating. And so you should put your thought that is not involved in the contract. Yes. Wait, I have to think about that for a moment, Judge. All right. So you're saying that there is lacking an affidavit that says we did not contemplate. Correct. So that's when we go to the next part of Dwarron and we're allowed to put on evidence of the actual substantial use of the vessel here, which this is an integral part of this construction job. And I want to note, Mr. Gibson, by his own testimony, says basically he's not going to be able to do his job for the welding crew if they can't do their job on the platform. And it is clear they are not going to be able to do their job of upgrading and repairing the platform without this vessel and its crane there to help them. In fact, this is Mr. Gibson's testimony on, let's see, this is page 155 to 156 of his deposition, is that for his own work and to be able to work with the fluid crane crew, he needed equipment moved off the platform in order to give them space to do their work. I do want to note something about the argument that just because the crew got out there first that day to work on the platform before the lift boat, that the lift boat wasn't expected to be out there. And I know where that's going because, bless you. In Dwarron, the barge at issue there came out halfway through the job. This case is not like Dwarron. Here you have Fieldwood several days beforehand arranging for the RAM-18 to go out there. It's under a 30-day time charm. And Fieldwood even arranges for the seabed to be scanned by a company called Fugro. The RAM-18 puts down its legs and is given permission to do so into the seabed at the platform. So there was significant planning involved of going over how to get this lift boat out there in a safe manner. So it is not like Dwarron where you just have an issue that arises halfway through the job and you need a vessel out there. I did want to note also Mr. Gibson's testimony that he did conduct meetings and JSAs on the lift boat. And that if you look at the time he spent on the RAM-18 for those several days as part of his job, his own time is over 50%. One thing I also wanted to note about the Crescent Energy case again, just going back to the substantial role that this vessel played in the job. In the Crescent Energy case which dealt with plug and abandon work out in the Gulf on a platform, the vessels involved, I believe, made up something like 30% or 37% of the cost of the overall job there. Here, it's well over 50% for this lift boat to be out there providing services. Thank you, Your Honor. Thank you, counsel. Case is under submission and we'll be back tomorrow.